UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 10-22963-CIV-O'SULLIVAN
[CONSENT]

MKT REPS S.A. DE C.V.,

    Plaintiff,

v.

STANDARD CHARTERED BANK
INTERNATIONAL (AMERICAS)
LIMITED,

    Defendant.
_____/

## ORDER

THIS MATTER is before the Court following a bench trial that was held on May 30-31, 2012. Having considered the post-trial filings, the evidence, and having heard closing arguments, it is

ORDERED AND ADJUDGED that the defendant, Standard Chartered Bank International (Americas) Limited, is entitled to judgment in its favor. As discussed below, the plaintiff, MKT REPS S.A. DE C.V.'s tortious interference with business relationships is barred by the economic loss rule. Additionally, there is no record evidence to prove that the defendant intended to interfere with the plaintiff's business relationships.

## DISCUSSION

I.    Standard for Findings and Conclusions by the Court

Rule 52(a)(1) provides:

> In an action tried on the facts without a jury ..., the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the

> evidence or may appear in an opinion or a memorandum of decision filed by the court. Judgment must be entered under Rule 58.

Fed. R. Civ. P. 52(a)(1).

II.     Factual Findings

MKT is a Mexican company in the business of international tourism and marketing. Pursuant to the terms of its contract with el Consejo de Promocion Touristica ("CPTM"), MKT specifically opened the account for international transactions and the transfer of funds. In or around July 2006, MKT opened a bank account (Client Number Portfolio or CIF 104763-1) ("the Account") with SCBI (under its former name, American Express Bank International, Inc. ["AEBI"]). Trial Ex. P-6, D-7 (Statement of Facts), D.E. # 81, ¶ 1. The account relationship between MKT and SCBI was established and is governed by certain account documents that were admitted into evidence in this case: the Account Application and Agreement for Corporations or Other Organizations, and addendums thereto, ("Account Application"), the Rules and Regulations Governing Accounts ("Account Rules and Regulations"), and the Nondiscretionary Investment Services Agreement ("NISA") (collectively, the "Account Agreements"). The General Pledge Agreement dated November 12, 2008 ("GPA"), executed by Mr. Ricardo Almiron, on behalf of MKT (the "Pledgor"), to secure certain credit obligations of "Juan Carlos Hinojosa" (the "Borrower") to SCBI. Trial Ex. D-69.

The Account Agreements provide the basis for SCBI's duties and obligations regarding the control and maintenance of or the withdrawal of funds from the Account. Under the express terms of the Account Agreements, MKT bargained for compensation for any economic loss that it would sustain if SCBI failed to control, maintain and/or

return funds in the Account. Pursuant to the Account Agreements, SCBI was authorized to restrict MKT's access to the funds in the Account which were pledged as collateral to secure the outstanding loan obligations of Juan Carlos Hinojosa on his $1,000,000 loan with SCBI. Trial Transcript (Day 2) pp. 157-59, 166-68, 173-77, 182-83.

On March 13, 2009, SCBI froze MKT's Account. Trial Ex. P-5. In an e-mail from Claudia De La Espriella, Manager of Client Services at SCBI, to Diana Rocha, an administrator with MKT, on March 13, 2009, at 8:22 a.m., Ms. De La Espriella informed Ms. Rocha that MKT was unable to access its funds in the account due to an "internal situation" at the bank, and that until it was resolved, SCBI could not do anything else to help MKT. Trial Ex. P-5. The freeze prevented MKT from wire transferring some funds from its Account to its international vendors. Trial Transcript pp. 119, 121, 124, 126 (Day 1). Some funds were released, other funds remained frozen until August 11, 2009, when €216,829.45 was transferred out of MKT's Account in the form of a wire transfer, leaving a balance of $1,954.10 as of August 31, 2009. There is no direct or circumstantial evidence to show that by "freezing" the Account, the defendant acted with any intent to cause MKT to lose its customers or contracts.

III.    **Analysis**

    A.    Economic Loss Rule Bars Tortious Interference Claim

Florida's economic loss rule provides that "'no cause of action [in tort] exists concurrent with a breach of contract claim unless there is damage due to [the alleged tortious conduct] that is separate from damages resulting from any subsequent contractual breach.'" Argonaut Dev. Group, Inc. v. SWH Funding Corp., 150 F. Supp.

2d 1357, 1363 (S.D. Fla. 2001). "The economic loss rule prevents a party from bringing a separate action in tort to recover for economic losses resulting from a breach of contract." HW Aviation LLC v. Royal Sons, LLC, 2008 WL 4327296, *4 (M.D. Fla. Sept. 17, 2008). A tortious interference claim is "barred by the economic loss rule [because] the conduct forming the basis of the tort is not independent of a breach of contract." Topp, Inc. v. Uniden American Corp., 483 F. Supp. 2d 1187, 1196 (S.D. Fla. 2007).

> In HW Aviation, the court explained
>
> "Underlying [the economic loss] rule is the assumption that the parties to a contract have allocated the economic risks of nonperformance through the bargaining process. A party to a contract who attempts to circumvent the contractual agreement by making a claim for economic loss in tort is, in effect, seeking to obtain a better bargain than originally made."

2008 WL 4327296, *4 (quoting Indemnity Ins. Co. of N. America v. Am. Aviation, Inc., 891 So. 2d 532, 536 (Fla. 2004)). "It is exactly this sort of legal alchemy, *i.e.*, the conversion of alleged breaches of contract into tort claims, that the economic loss rule was designed to prevent." Eclipse Medical, Inc. v. American Hydro-Surgical Instruments, Inc., 262 F. Supp. 2d 1334, 1338 (S.D. Fla. 1999), aff'd, 235 F.3d 1344 (11th Cir. 2000). The economic loss rule applies even where an alleged breach is intentional. Topp, 483 F. Supp. 2d at 1196-97. The economic loss rule applies regardless of the type of economic losses that are claimed by a plaintiff - direct or consequential. See Indemnity Ins. Co. of North America v. American Aviation, Inc., 891 So. 2d 532, 543 (Fla. 2004).

MKT's claim of right to immediate possession of funds in its Account exists by virtue of certain contracts and agreements between MKT and SCBI, which govern the Account. The Account Agreements provide the basis for SCBI's duties and obligations

regarding the control and maintenance of or the withdrawal of funds from the Account. Under the express terms of the Account Agreements, MKT bargained for compensation for any economic loss that it would sustain if SCBI failed to control, maintain and/or return funds in the Account.  Pursuant to the Account Agreements, SCBI was authorized to restrict MKT's access to the funds in the Account which were pledged as collateral to secure the outstanding loan obligations of Juan Carlos Hinojosa on his $1,000,000 loan with SCBI.  Trial Transcript (Day 2) pp. 157-59, 166-68, 173-77, 182-83; see Carl v. Republic Security Bank, 282 F. Supp. 2d 1358 (S.D. Fla. 2003)(finding bank's exercise of lawful contractual setoff rights by freezing accounts did not support tortious interference claim); Topp, Inc., 483 F. Supp. 2d at 1196.

MKT's tortious interference claim is premised on the same conduct - the intentional and "unjustifiable freeze" of the Account - that was the crux of MKT's dismissed contract claim.  Trial Ex. D-7.  The economic loss rule bars MKT from re-labeling the breach of contract claim as a tortious interference claim.  SCBI's alleged wrongful conduct is not independent from its duties and obligations under the Account Agreements.  Because SCBI has not committed a breach of duty apart from a breach of contract, the tortious interference claim is barred by the economic loss rule.  Indemnity Ins., 891 So. 2d at 537; see Eclipse Med. Inc., 262 F. Supp. 2d at 1356-57.

  B. <u>No Evidence to Show Intent to Interfere</u>

Under Florida law, to state a claim for tortious interference with a business relationship, a plaintiff must show: 1) the existence of a business relationship, not necessarily evidenced by a contract; 2) the defendant's knowledge of the business relationship; 3) the defendant's intentional and unjustified interference with the

relationship; and 4) damage to the plaintiff as a result of the breach of the relationship. Tamiami Trail Tours, Inc. v. Cotton, 463 So. 2d 1126, 1127 (Fla. 1985); Ethan Allen, Inc. v. Georgetown Manor, Inc., 647 So. 2d 812 (Fla. 1994).

There is no need to address the first, second or fourth elements, because there is no record evidence to satisfy the third element. The third element, "intentional and unjustified interference," requires evidence that the defendant acted with the intent to interfere specifically with MKT's alleged business or contractual relationships. Ethyl Corp. v. Balter, 386 So. 2d 1220 (Fla. 3d DCA 1980)). In Balter, the court found that "there was a total lack of proof of a direct interference with [the Balter-Wolf] agreement, which is indispensible to the existence of an actionable wrong." Id. at 1223. In Balter, "the evidence presented at trial conclusively established and Balter has admitted that Ethyl never attempted to interfere directly with the Balter-Wolf relationship, and did not even communicate with Wolf until after he had already withdrawn his $100,000." Id. The Balter court held that "there is no such thing as a cause of action for interference which is only negligently or consequentially effected." Id. at 1224 (citing 4 Restatement (Second) of Torts §766 C (1979) (other citation omitted).

"In order to prevail on a tortious interference claim, a plaintiff must establish the defendant's intent to interfere, as opposed to the defendant's mere intent to act." Maxi-Taxi of Florida, Inc. v. Lee County Port Authority, 2008 WL 1925088, at *16 (M.D. Fla. Apr. 29, 2008). In Maxi-Taxi, the defendant implemented a regulation that restricted the plaintiff from using certain traffic lanes and parking areas at the airport. The plaintiff alleged that the defendant "intentionally disrupted the relationship between plaintiffs and their customers" by this regulation, which "resulted in a significant loss of business"

6

to the plaintiff.  The Maxi-Taxi court found that the defendant's conduct did not support a claim for tortious interference.  It found that "the only evidence of record regarding the defendant's motivation is that provided by defendant, which indicates that it promulgated the regulation in order to address issues of traffic congestion, public safety, and Airport security." Id. at 17.

The plaintiff relies heavily on Gossard v. Adia Services, Inc., 723 So. 2d 182 (Fla. 1998). Response at 8 (DE# 128, 6/25/12) In its response, the plaintiff concedes that "[t]he essential thing is the intent to cause the result." Id. (citing Gossard). The defendant argues that it lacked the requisite intent.  Gossard is factually distinguishable.  In Gossard, the Supreme Court of Florida "answered [the Eleventh Circuit's certified] question in the affirmative provided there is evidence proving the elements of tortious interference with a business relationship we set forth in Ethan Allen, Inc. v. Georgetown Manor, Inc., 647 So. 2d 812 (Fla. 1994)." Id.  The Eleventh Circuit's certified question was:

> Whether Florida law recognizes a claim for tortious interference against a corporation which purchases as a subsidiary a corporation which has a preexisting obligation not to compete against its franchisee, plaintiff herein, and subsequently purchases another subsidiary which is in direct competition with the franchisee?

Gossard v. Adia, 120 F.3d 1229 (11th Cir. 1997).

In Gossard, the Supreme Court of Florida understood the plaintiff's theory of the case as follows: "[that] by purchasing Star-Med, Adia knowingly cause Nursefinders to be in breach of its 'promise' to Gossard that neither a parent nor affiliate of Nursefinders would provide similar health care services within Gossard's territory." Gossard, 723 So. 2d at 184.  The facts established that "Adia was aware of [the non-

7

compete agreement between Nursefinders and Gossard] when [Adia] purchased Nursefinders.  Adia then purchased Star-Med, a direct competitor of Gossard located in Gossard's territory."  Id.

Comment h to Section 766 of the Restatement (Second) of Torts states in pertinent part:

> *Inducing or otherwise causing. ...* The phrase "otherwise causing" refers to situations in which ... performance of B of his contract with C necessarily depends upon the prior performance of A of his contract with B and A fails to perform in order to disable B from performing for C.  This rule stated in this Section applies to any intentional causation whether by inducement or otherwise.  The essential thing is the intent to cause the result.  If the actor does not have this intent, his conduct does not subject him to liability under this rule even if it has the unintended effect of deterring the third person from dealing with the other.

Restatement (Second) of Torts § 766 cmt. h (1979).

In Gossard, the Supreme Court of Florida held:

> [a]ssuming the trial record contains sufficient evidence to support this theory, we conclude that the allegations establish a prima facie case of tortious interference under our decision in Ethan Allen.  We hold that our precedent is consistent with section 766 of the Restatement [of Torts] and comment h thereto.  Gossard's assertions regarding Adia's conduct in this case fall within the "otherwise causing" language of the Restatement.

Gossard, 723 So. 2d at 185.

The plaintiff's also relies on Tamiami Trail Tours, Inc. v. Cotton, 463 So. 2d 1126 (Fla. 1985) for the proposition that the third element of tortious interference does not require a showing that the interference was intended to secure a business advantage. Id. at 1127-28.  Tamiami Trail distinguished between two forms of motive – malice or greed – and held that either may result in tortious interference.  Id. at 1128 (explaining that there is "no logical reason why one who damages another in his business

8

relationships should escape liability because his motive is malice rather than greed.") The plaintiff argues that the defendant was motivated by its own self-interest and desire to retain the benefits of the funds deposited in the plaintiff's account.... Response at 11.  The plaintiff further contends that the defendant's inappropriate restriction of the plaintiff's funds was not the result of their supposed contractual right under the General Pledge Agreement, but rather the result of the bank's own desire to retain the benefit of the money deposited in the account.  Id.  There is no evidence in the record to support the plaintiff's assertions.

In the present case, there is no direct or circumstantial evidence to show that by "freezing" the Account, the defendant acted with any intent to cause MKT to lose its customers or contracts, much less acted with any purpose for that matter to affect MKT's alleged business or contractual relationships. See Maxi-Taxi, at *12, 17 ("Without any evidentiary support for Plaintiffs' claims, the Court will *not* infer from the consequences of the regulation the requisite intent to interfere with Plaintiffs' business relationships."). Because the plaintiff has failed to show that the defendant intended to interfere with the plaintiff's business relationships, the plaintiff has failed to prove the elements of tortious interference with a business relationship and the defendant is entitled to judgment in its favor.

DONE AND ORDERED, in Chambers, at Miami, Florida, this **20th** day of July, 2012.

JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
All Counsel of Record